**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 07-cv-02396-CMA

FERNANDO BOTELLO,

      Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

---

Pursuant to 42 U.S.C. § 405(g), Plaintiff Fernando Botello appealed from the

denial of disability benefits by the Social Security Commissioner ("Commissioner").

After a hearing on Plaintiff's application, the Administrative Law Judge ("ALJ") found that

Plaintiff was not "disabled" within the meaning of the Social Security Act ("Act") because

Plaintiff could perform gainful work within the regional and national economies despite

his back injury.

This is Plaintiff's second appeal.  He previously appealed the Commissioner's

denial of benefits to this Court.  On that appeal, Judge Daniel remanded the case to the

ALJ for further proceedings.  On remand, the ALJ issued the decision that is currently at

issue.

## BACKGROUND

### I.  MEDICAL HISTORY

Plaintiff alleges that he became disabled on September 1, 1999.[1]  He claims that his back pain, diabetes and mental condition preclude him from obtaining gainful employment.  (*See, e.g.,* Administrative Record ("Admin.") at 103 and 110.)

Plaintiff was born November 4, 1953.  (*Id.* at 79.)  He has a seventh-grade education and can speak and understand English.  (*Id.* at 109.)  At the time he filed his application in 2001, Plaintiff had been married, divorced, and re-married.  (*Id.* at 79.)  He alleges that he suffered a work-related back injury in 1993.  The injury causes him pain and numbness in his back, legs, and feet.  He also alleges that he suffers from diabetes mellitus and, at various times, from depression and anxiety.  He has seen multiple doctors, rehabilitation specialists, and a chiropractor for treatment.

Plaintiff contends that his back injury drastically curtailed his daily routine.  First and foremost, he alleges that he can no longer work.  However, he states that he can care for himself, but he rarely cooks because someone else in the house does it for him.  (*Id.* at 121.)  He states that he can dust and vacuum until his back pain forces him to stop.  (*Id.* at 120.)  He sometimes reads the paper, watches classic TV reruns, and listens to country radio.  (*Id.*)  He does not identify many hobbies or leisure activities, but he states that he often visits with friends at a local coffee shop.  (*Id.*)

---

[1]  Plaintiff originally alleged an onset date of January 1, 1994, but he amended the date after remand from the district court.

The medical history confirms Plaintiff's allegation of a back injury at the L4-L5 and L5-S1 levels. An MRI taken in 1993 revealed "narrowing of the L5-S1 disc space," a "lateral disc protrusion" at the L4-L5 level and "disc dehydration and lack of signal on the T2 acquisitions," which, according to the radiologist, evidence "[d]egenerative disc disease." (*Id.* at 230.) Likewise, x-rays of the lumbosacral spine taken in 1995 revealed "multilevel spondylosis." (*Id.* at 243.) A second MRI taken in 1997 reflects a progression of Plaintiff's back problems: "mild diffuse bulging" at the L2-L3 level, "minimal diffuse bulging" at the L3-L4 level, "a small left paracentral disc protrusion" at the L4-L5 level and "minimal disc bulge centrally" at the L5-S1 level. (*Id.* at 232.) A third MRI taken in December 2000, again revealed "multilevel degenerative changes spanning from L2-S1, worse at the L4-L5 level." (*Id.* at 169.) However, the third MRI disclosed "no real significant change compared to the previous study of July 1997." (*Id.*) Another x-ray in 2001 showed "mild degenerative changes" but found no evidence of spondylolysis.[2] (*Id.* at 211.)

Plaintiff's physical exams also confirmed a back problem, but varied in their conclusions. A 1993 physical examination revealed that Plaintiff had full strength his right leg, 5/5, and almost full strength in his left leg, 5-/5 and 4/5. (*Id.* at 227.) This exam also showed a large range of forward flexion, side bending and a negative straight leg raise. (*Id.*) Physical examinations from 1994 through 1998, by Plaintiff's treating

---

[2]   Spondylolysis is not the same as spondylosis, although both terms reference degenerative problems with the spine and back.

physician, Dr. Lorne Weeks, III, revealed subjective complaints of pain in the lower back and across both lower extremities. *See, e.g., id.* at 246 ("lower back pain . . . and lower extremity numbness"), 244 ("lower back pain . . . and lower extremity pain"), 243 ("migratory bilateral lower extremity pain"), 319 ("lower back pain and bilateral lower extremity pain"). But the examinations revealed little in the way of objective worsening of Plaintiff's condition. Plaintiff treated his symptoms with physical therapy, chiropractic care from Dr. Melvin Kallsen, and pain medications. (*Id.* at 212, 265 and 332.) Plaintiff also discussed surgical options with his doctors, but the consensus among his treaters was that surgery would not be the best course of action. (*Id.* at 319.)

Plaintiff achieved varying degrees of relief from his symptoms. For example, in April 1996 records from Plaintiff's family physician, Dr. Kevin Lindell, Plaintiff stated that his "back is starting to feel better" (*Id.* at 159.) This record contradicts somewhat with a September 1996 record from Dr. Christopher Ryan, an examining physician, who noted that Plaintiff appeared "quite uncomfortable" with a limited range of motion. (*Id.* at 197.) Yet, in 1999, Dr. Weeks noted that chiropractic care by Dr. Kallsen "provided significant pain relief." (*Id.* at 236.) By 2001 Plaintiff stated that his foot pain was improving and his back was "not giving him much of a problem." (*Id.* at 152.) His back pain decreased when he went swimming. (*Id.*)

The records regarding Plaintiff's diabetes are less explicit. On multiple occasions Dr. Lindell notes that Plaintiff had trouble controlling his blood sugar levels, but Dr. Lindell does not identify any functional limitations resulting therefrom. (*Id.* at 159-61.)

4

Case 1:07-cv-02396-CMA   Document 22   Filed 04/13/09   USDC Colorado   Page 5 of 26

For example, in 1997, Dr. Lindell conducted a physical examination so that Plaintiff could attend a Boy Scout camping trip with his son and noted that Plaintiff's diabetes was poorly controlled.  (*Id.* at 156.)  However, Dr. Lindell suggested that Plaintiff wait before adjusting his insulin or other medications.  (*Id.*)  In 2001, Dr. Lindell's records reflect that Plaintiff's diabetes was "doing well."  (*Id.* at 147.)  However, lab tests from 2002 and 2003 indicated "poor control" of Plaintiff's diabetes.  (*Id.* at 323.)  In October 2003, Dr. Lindell noted that Plaintiff had begun to experience diabetic neuropathy.  However, in this 2003 note, Dr. Lindell points out that his own records did not demonstrate any neuropathy prior to 1999.  (*Id.* at 342.)

The extent of Plaintiff's mental health problems is also difficult to discern. Plaintiff alleges that he had problems concentrating and that he struggled with depression and anxiety as a result of his injury.  Plaintiff's allegations are supported by a 2002 report from Dr. Ryan, who checked boxes indicating that Plaintiff's "depression" and "anxiety" affected his physical condition.  (*Id.* at 294.)  A 2002 psychological evaluation by Dr. Gale Giebler, Ph.D., also found Plaintiff's outlook was "grim."  (*Id.* at 261.)  She found him to be irritable, sleep deprived, with suicidal ideation and without hope or optimism.  (*Id.*)  However, medical records from Plaintiff's treating doctor reveal that, immediately before and shortly after his alleged onset date, Plaintiff had successfully dealt with his mental health symptoms by using an unknown over-the-counter medication and prescription Xanax or Prozac.  In 1998, Plaintiff told Dr. Lindell that he had started taking an over-the-counter anti-depressant and "feels really good."

(*Id.* at 155.)  In 2001, Plaintiff reported to Dr. Lindell that his mood had improved and his depression "seems to be doing pretty well."  (*Id.* at 152.)  A consultative exam by Dr. Tim Moser in 2001 found that Plaintiff's depression was "treated with medication, and is now completely asymptomatic."  (*Id.* at 207.)  Likewise, in a 2003 report by the state disability physician, Dr. J.F. Dyde found no medically determinable psychiatric impairment prior to December 31, 1999.  (*Id.* at 305.)

In addition to the above-described examinations, Plaintiff underwent multiple assessments to determine his functioning capacity and impairment ratings.[3]  These assessments varied quite a bit in their conclusions.  In 1993, Dr. Howard Place evaluated Plaintiff and found almost full strength in the legs and with "no acute distress." (*Id.* at 227.)  In 1995, Dr. Ryan examined Plaintiff and his records and found "moderate to severe" limitations on Plaintiff's forward bending, moderate limitations on lateral flexion with pain each way, positive straight leg raising, and anterior compartment weakness on the left side.  (*Id.* at 202.)  A 1997 exam by Dr. Franklin Shih showed that Plaintiff had mild antalgia (a limp), forward flexion to 70 degrees, extension to 15-20 degrees, and mild limitation on his side bending and rotation.  (*Id.* at 182.)

The most relevant capacity assessment occurred in 1999 on the recommenda-tion of Dr. Weeks.  During that exam, the rehabilitation specialist found that Plaintiff could sit continuously for thirty minutes with an accumulated time of two hours and

---

[3]  Both parties reference Plaintiff's "impairment ratings," an assessment apparently used in evaluating workers compensation insurance claims.  Those ratings do not really concern this Court, except to the extent that the treating doctors calculating the ratings concurrently described objective medical opinions regarding Plaintiff's condition.

twenty-eight minutes.  (*Id.* at 177.)  The specialist recommended that Plaintiff be

allowed to change sitting positions after twenty minutes.  (*Id.*)  Plaintiff could also

stand and/or walk continuously for twenty-three minutes.  (*Id.*)  Again, the specialist

recommended frequent positional changes.  (*Id.*)  However, objective tests conducted

during this assessment reflected that Plaintiff did not put forth "full maximal effort during

testing."  (*Id.*)  Thus, the specialist concluded that Plaintiff was "inconsistent with reports

of his pain," the assessment results should be considered Plaintiff's "minimum

capabilities," and Plaintiff was "possibly capable of more than what he demonstrates."

(*Id.* at 178.)

Dr. Ryan found even more restrictions on Plaintiff's functional capacities.

In 2002, he reported to Plaintiff's attorneys that Plaintiff had a "poor" prognosis.  (*Id.* at

293.)  Dr. Ryan limited Plaintiff to ten minutes of sitting, fifteen minutes of standing and

found that Plaintiff could not walk a single city block without rest or severe pain.  (*Id.* at

294.)  Dr. Ryan concluded that Plaintiff could stand/walk for up to two hours out of an

eight-hour day with frequent, unscheduled breaks.  (*Id.* at 295.)  Dr. Ryan also limited

Plaintiff to rarely lifting ten pounds or less, never lifting more than ten pounds, rarely

twisting, and never bending, crouching and climbing ladders or stairs.  (*Id.* at 295-96.)

He concluded that Plaintiff would miss more than four days per month as a result of

Plaintiff's impairments.  (*Id.* at 296.)

Dr. Lindell offered a somewhat less restrictive opinion when he wrote to Plaintiff's

attorney in 2003 to retrospectively assess Plaintiff's capacity prior to December 1999.

Dr. Lindell concluded that Plaintiff was "somewhat typical of a patient with chronic low back pain . . . ." (*Id.* at 342.)  Dr. Lindell suggested that Plaintiff could not have lifted more than twenty pounds, sat or stood for longer than thirty minutes and would have not been able to repeatedly bend or twist. (*Id.*)  Dr. Lindell found no restrictions on Plaintiff's ability to finger or grasp objects with his hands. (*Id.*)

Other reports found fewer restrictions on Plaintiff's vocational abilities. Dr. Moser's 2001 exam found 5/5 strength in both the upper and lower extremities and he concluded that Plaintiff could stand/walk for six hours out of an eight-hour day and he placed no restrictions on Plaintiff's ability to sit. (*Id.* at 209.)  Another consultative exam of Plaintiff's records by Dr. Alan Ketelhohn found Plaintiff could occasionally lift 50 pounds, frequently lift twenty-five pounds and sit/stand/walk for about six hours in an eight-hour day. (*Id.* at 141.)  In contrast, Plaintiff's chiropractor, Dr. Kallsen opined that Plaintiff was "unable to work at any sort of heavy labor and light labor would have to be restricted heavily as [Plaintiff] could not maintain any position for any length of time." (*Id.* at 212.)

## II.     PROCEDURAL HISTORY

### A.     Plaintiff's Prior Appeal

As noted above, this is Plaintiff's second appeal before this Court.  Plaintiff originally filed his application for benefits in April 2001. (*Id.* at 79.)  The state denied his application and Plaintiff requested a hearing. (*Id.* at 67.)  The ALJ held a hearing in September 2003 and denied Plaintiff's application by written decision in October 2003.

(*Id.* at 16-28.)  The ALJ found that Plaintiff was not disabled because he could perform jobs existing in the national economy.  (*Id.*)  The Appeals Council denied Plaintiff's request for review and Plaintiff appealed to this Court.  (*Id.* at 8-11.)  Judge Daniel remanded the case for further administrative proceedings.  (*Id.* at 523.)

He directed the ALJ to examine the vocational expert with respect to his opinions vis-a-vis the *Dictionary of Occupational Titles*, consider the factors set forth in *Trimiar v. Sullivan*, 966 F.2d 1326, 1330 (10th Cir. 1992), including the distance Plaintiff would have to drive to any job suggested by the vocational expert, to properly explain the weight the ALJ gave to the medical evidence in determining Plaintiff's Residual Functioning Capacity ("RFC"), and to properly evaluate Plaintiff's credibility regarding non-exertional limitations.  (Admin. at 524-35.)

After a new hearing in 2007, the same ALJ found that Plaintiff was not disabled on or before December 31, 1999.  (*Id.* at 478-90.)  The Appeals Council again denied Plaintiff's request for review, making the ALJ's decision the final administrative action. Plaintiff followed with the instant appeal.

### B.      The ALJ Hearings

#### 1.      Plaintiff's Testimony

At the 2007 hearing, Plaintiff chose to rely on his testimony from the 2003 hearing.  Thus, the transcript from the 2003 hearing was made part of the written record and Plaintiff presented very little new evidence at the second hearing.  (*Id.* at 597.) Instead, Plaintiff stated only that his pain had gotten worse since the 2003 hearing

and that he had moved from Ft. Morgan, Colorado, to Denver, immediately before the second hearing.  (*Id.* at 596.)

At the 2003 hearing, Plaintiff testified regarding his work history at Car Quest, DNT, Quick Change Oil and Lube, and Cenex.  He worked at Car Quest from 1985 to 1991 as a runner, delivering auto parts.  (*Id.* at 436.)  At DNT and Quick Change, he stated that he occasionally changed oil, but mostly washed and detailed cars.  (*Id.* at 435.)  At Cenex, where he was working when he suffered his back injury, he repaired flat tires.  (*Id.*)  Plaintiff stated that he had not worked since September 1999.  (*Id.* at 437.)

Regarding his functional capacities, Plaintiff stated that he could sit for twenty to thirty minutes before he had to stand up and stretch.  (*Id.*)  He could stand for five to ten minutes before the pain in his lower back caused him to sit down.  (*Id.*)  Plaintiff testified that if he stood too long, the pain caused his legs to go numb and he sometimes fell down.  (*Id.* at 438.)  His feet hurt and he had trouble balancing, especially on stairs. (*Id.* at 450.)  He also stated that he could not lift any weight in 1999 and that he disagreed with the 1999 functional capacity evaluation, which indicated that he could lift up to forty or 50 pounds.  (*Id.*)  He testified that he could not complete the capacity evaluation because of the pain in his lower back.  (*Id.* at 449.)  He felt that he could work only four days per month and that he would need many unscheduled breaks during an eight-hour day because of his diabetes and his back pain.  (*Id.* at 454-55.)

Plaintiff also stated that his diabetes was out of control and that his blood sugar levels were high.  (*Id.* at 439.)  His diabetes caused him to feel faint, like he was going to pass out.  (*Id.*)

Regarding his daily activities, Plaintiff stated that he would get out of bed, have a bowl of cereal, watch the news and attend his doctors appointments.  (*Id.* at 440.)  He stated that he sometimes took his son to school or picked him up, but he did not do anything around the house.  (*Id.* at 441.)  He no longer met friends for coffee or participated in other hobbies like motorcycling or baseball because of the pain and because he began to fear public interaction.  (*Id.* at 451 & 458.)  He stated that he did not sleep well or have energy and that he took naps because his wife worked and he was home alone much of the time.  (*Id.* at 442.)  Plaintiff could put on his shoes and socks, but he did not wear shoes with laces because he could not bend down to tie them.  (*Id.* at 453.)

Plaintiff took Prozac and a multitude of other drugs including Vioxx, diazepam, and hydrocodone.  (*Id.* at 445.)  The drugs made him drowsy, gave him headaches, and affected his appetite, so he reduced the number of pills he was taking between 1999 and the 2003 hearing.  (*Id.* at 446.)  He also stated that he struggled with anxiety and he had suicidal ideation because, as Plaintiff put it, he "wasn't thinking right.  [He] wasn't sleeping right."  (*Id.* at 447.)

2.     The Vocational Expert's Testimony

Martin Rauer, a state vocational expert, reviewed Plaintiff's file and testified

at the 2007 ALJ hearing.[4]  (*Id.* at 598.)  The ALJ asked Mr. Rauer to assume a

hypothetical person with Plaintiff's age, education and work history, who could

occasionally lift fifty pounds, frequently lift twenty-five pounds, would need to the option

to sit and stand throughout the day at twenty-minute intervals and who could tolerate

only occasional stooping, bending and squatting.  (*Id.* at 599.)  The ALJ then asked

whether that hypothetical person could perform Plaintiff's previous jobs, to which

Mr. Rauer answered, no.  (*Id.*)  However, Mr. Rauer stated that other jobs were

available for such a person, including:  scale attendant, storage facility rental clerk and

surveillance system monitor.  (*Id.* at 600.)  Mr. Rauer stated that there would be some

erosion in the number of available jobs because of the sit-stand option under the

hypothetical provided, but the erosion was not significant.  (*Id.*)

The ALJ then asked about a second hypothetical person who could lift and carry

twenty pounds occasionally, ten pounds frequently, who could occasionally bend, stoop

and climb stairs but could never climb ladders, twist or crouch.  This person would need

to avoid extreme temperatures and could sit and/or stand for thirty minutes at a time for

a total of four hours during an eight-hour day.  (*Id.* at 601.)  Mr. Rauer answered that the

scale attendant and surveillance system monitor jobs remained unchanged, but that the

---

[4]   Mr. Rauer was not involved with Plaintiff's first ALJ hearing in 2003.

available jobs for storage facility rental clerk would be eroded by around 75% because of the exposure to heat and/or cold and the sit/stand option.  (*Id.* at 602.)

### C.    The ALJ's 2007 Decision

In his second written decision, the ALJ again found that Plaintiff was not disabled within the meaning of the Act.  The ALJ described Plaintiff as having the RFC to lift and carry up to twenty pounds occasionally and ten pounds frequently, sit and stand for thirty minutes at a time for a total up to four hours out of an eight-hour day, occasionally bend, stoop and climb stairs but could never twist, crouch or climb ladders.  (*Id.* at 490.) The ALJ also found that Plaintiff should avoid temperature extremes.  Although the ALJ did not use the term, these limitations correspond to light work.  The ALJ found that Plaintiff, although impaired by his back injury and the above-described RFC, could find work in the national and regional economy.  (*Id.*)  Specifically, the ALJ found that Plaintiff could perform work as a scale attendant, "furniture" rental clerk,[5] and surveillance system monitor.  (*Id.*)

### STANDARD OF REVIEW

Section 405(g) of the Social Security Act establishes the scope of this Court's review of the Commissioner's denial of disability insurance benefits.  *See* 42 U.S.C. § 1383(c)(3) (2006) (incorporating review provisions of 42 U.S.C. § 405[g]).  Section 405(g) provides, in relevant part, that:

---

[5]   The ALJ mistakenly used "furniture rental clerk" in his written decision.  Both parties and this Court recognize that the ALJ meant to refer to the job described by the vocational expert, storage facility rental clerk.

> [t]he findings of the Commissioner of Social Security as to any fact, if
> supported by substantial evidence, shall be conclusive, and where a
> claim has been denied by the Commissioner of Social Security or a
> decision is rendered under subsection (b) of this section which is adverse
> to an individual who was a party to the hearing before the Commissioner
> of Social Security, because of failure of the claimant or such individual
> to submit proof in conformity with any regulation prescribed under
> subsection (a) of this section, the court shall review only the question
> of conformity with such regulations and the validity of such regulations.

42 U.S.C. § 405(g).  Thus, this Court's review is limited to determining whether the

record as a whole contains substantial evidence supporting the Commissioner's

decision.  *See* § 405(g); *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495,

1497–98 (10th Cir. 1992).  The Court must uphold the Commissioner's decision if it is

supported by substantial evidence.  *See Dollar v. Bowen*, 821 F.2d 530, 532 (10th Cir.

1987).  This Court cannot re-weigh the evidence nor substitute its judgment for that of

the ALJ.  *Jordan v. Heckler*, 835 F.2d 1314, 1316 (10th Cir. 1987).  That does not

mean, however, that review is merely cursory.  To find that the ALJ's decision is

supported by substantial evidence, the record must include sufficient relevant evidence

that a reasonable person might deem adequate to support the ultimate conclusion.

*Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987).  A decision is not based on

substantial evidence if it is overwhelmed by other evidence in the record or if there is a

mere scintilla of evidence supporting it.  *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir.

1985).  The ALJ's decision is also subject to reversal for application of the wrong legal

standard.  *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Frey*, 816 F.2d at 512.

14

## ANALYSIS

Under the standard of review described above and the applicable law described below, the Court affirms the ALJ's decision.

## III.   APPLICABLE LAW

A claimant must qualify for disability insurance benefits under the Social Security Act.  To do so, the claimant must meet the insured status requirements and be less than sixty-five years of age and under a "disability."  *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991).  The Social Security Act defines a disability as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  In proving disability, a claimant must make a prima facie showing that he is unable to return to the prior work he has performed.  *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).  Once the claimant meets that burden, the Commissioner must show that the claimant can do other work activities and that the national economy provides a significant number of jobs the claimant could perform. *Frey*, 816 F.2d at 512.

The Commissioner has established a five-step process to determine whether a claimant qualifies for disability insurance benefits.  *See* 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987) (describing five-step analysis).  A claimant may be declared disabled or not disabled at any step; and, upon such a determination, the

subsequent steps may be disregarded. *See* 20 C.F.R. § 404.1520(a); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988). First, the claimant must demonstrate that he is not currently involved in any substantial gainful activity. 20 C.F.R. § 404.1520(b). Second, the claimant must show a medically severe impairment (or combination of impairments) which limits his physical or mental ability to do basic work activities. § 404.1520(c). At the third step, if the impairment matches or is equivalent to established listings, then the claimant is judged conclusively disabled. § 404.1520(d). If the claimant's impairments are not equivalent to the listings, the analysis proceeds to the fourth step. At this stage, the claimant must show that the impairment prevents him from performing work he has performed in the past. *See Williams*, 844 F.2d at 751 (citations omitted). If the claimant is able to perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e); *Williams*, 844 F.2d at 751. The fifth step requires the Commissioner to demonstrate that: (1) the claimant has the RFC to perform other work based on the claimant's age, education, past work experience; and (2) there is availability of that type of work in the national economy. *See* 20 C.F.R. § 404.1520(f); *Williams*, 844 F.2d at 751.

## IV.    THE ALJ'S DECISION IS SUPPORTED BY SUBSTANTIAL EVIDENCE.

Plaintiff argues that the ALJ erred in four respects: (1) the ALJ failed to consider the distance Plaintiff had to drive and the effects of his medications when determining whether significant numbers of jobs existed in the national economy; (2) the ALJ erred in rejecting portions of Dr. Lindell's opinion without explanation; (3) the ALJ should have

requested a medical consultation pursuant to *Blea v. Barnhart*, 466 F.3d 903 (10th Cir.

2006), because the onset of Plaintiff's disability could not be determined from the

record; and (4) the ALJ should have accepted the opinion of Plaintiff's chiropractor,

Dr. Kallsen, but did not do so.

**A.     The ALJ Considered The *Trimiar* Factors When Analyzing The Number Of Available Jobs.**

Courts have declined to set a rule as to what constitutes a "significant number" of

jobs in the national economy for purposes of the Act.  *See Trimiar v. Sullivan*, 966 F.2d

1326, 1330 (10th Cir. 1992).  Instead, the ALJ should make the decision based on the

individual merits of the case and common sense.  *Id.*  *Trimiar* provides a list of non-

exclusive factors for the ALJ to consider, including:  the level of a claimant's disability,

the reliability of the vocational expert's testimony, the reliability of a claimant's

testimony, the distance the claimant can travel to engage in the work, the isolated

nature of the jobs identified, and the types and overall availability of the work identified.

*Id.*  Despite the travel component suggested in *Trimiar*, the governing regulations and

statute make clear that work need not exist in the immediate area where the claimant

lives.  For example, 20 C.F.R. § 404.1566 states that, if work exists in significant

numbers nationally, "[i]t does not matter whether–(1) works exists in the immediate area

in which you live . . . ."  *See also* 42 U.S.C. § 423(d)(1)(A)(2) ("'work which exists in the

national economy' means work which exists in significant numbers either in the region

where such individual lives *or in several regions of the country*") (emphasis added).

When viewed in light of the regulatory and statutory mandate, *Trimiar*, although binding

precedent, does not establish a mandatory requirement that an ALJ explain and describe how he applied each factor in every case.

Based on Judge Daniel's 2006 order remanding the case, Plaintiff argues that the ALJ should have been more explicit in analyzing the *Trimiar* factors when he found that a significant number of jobs existed in the national economy for a person with Plaintiff's RFC.  Specifically, Plaintiff contends that the ALJ did not take into account the distance that Plaintiff would have to drive to engage in the jobs identified by Mr. Rauer. Plaintiff highlights the fact that he lived in a relatively rural area during the time period in question and that he could sit (*i.e.*, drive) for no more than thirty minutes.  Plaintiff also contends that his medication made driving unsafe.  Thus, Plaintiff argues that his situation was unique for purposes of determining whether a significant number of jobs existed and that Judge Daniel recognized that fact, but the ALJ did not.

In his 2007 decision, the ALJ did an admirable job laying out the standards used to determine whether jobs existed in significant numbers in the national economy. (Admin. at 487-89.)  The ALJ also corrected two missteps from his previous decision, wherein he relied on a vocational expert whose opinions conflicted with the *Dictionary of Occupational Titles* and lacked any knowledge about the number of jobs available in Colorado.  However, although he cited the *Trimiar* factors, the ALJ did not discuss them in any depth with respect to how they related to Plaintiff's situation.  This omission calls into question the ALJ's adherence to Judge Daniel's previous Remand Order, but this

Court finds substantial evidence to show that the ALJ did consider Plaintiff's ability to drive to a job in his determination as to whether a significant number of jobs existed.

Judge Daniel expected the ALJ to "consider" Plaintiff's argument that he lived in a remote area and that he might have difficulty driving long distances to a job: "[T]he ALJ should also consider Plaintiff's argument that he lives in a remote area of Colorado and that his prescription medication are not conducive to safe driving." (*Id.* at 530.) Judge Daniel did not require the ALJ to provide an in-depth analysis and discussion of the driving distance, nor does *Trimiar*, itself require the ALJ to mechanically analyze each factor.

Plaintiff argues that the ALJ merely went "through the motions" without actually considering the distance Plaintiff would have to drive.  However, the ALJ provided abundant discussion of the law and policy behind the "significant numbers" requirement. The Commissioner argues, and this Court agrees, that the ALJ's discussion indicates that he did in fact "consider" the distance Plaintiff would have to drive when determining whether significant numbers of jobs existed.  The Court notes that listing the *Trimiar* factors is different than analyzing them, but the ALJ went beyond merely listing the factors, he included a solid discussion of their purpose and statutory foundation. Although the ALJ's decision could have been more explicit on the driving distance factor, his discussion of the "significant numbers" requirement provides substantial evidence that the ALJ thought about, took into account, and otherwise adhered to Judge Daniel's direction to "consider" the distance Plaintiff would have to drive to get to a job.

Accordingly, remand is not warranted on this issue.

**B.     The ALJ Properly Adopted Dr. Lindell's Opinions.**

Plaintiff argues that the ALJ cherry-picked only those portions of Dr. Lindell's opinion that supported a denial of Plaintiff's application.  Particularly, Plaintiff contends that the ALJ should not have rejected Dr. Lindell's opinions that (1) Plaintiff would miss at least four days of work per month; (2) Plaintiff had symptoms that would interfere with his ability to concentrate and pay attention; (3) Plaintiff was capable of only low stress jobs; (4) Plaintiff would need to change positions and walk around every thirty minutes; and (5) Plaintiff would need to take unscheduled breaks.  Dr. Lindell offered these opinions primarily in his 2002 "Diabetes Mellitus Residual Functional Capacity Questionnaire."  (Admin. at 289-96.)

Plaintiff is correct that the ALJ cannot "pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability."  *Robinson*, 366 F.2d at 1083.  However, the ALJ can properly reject opinions of a treating physician if those opinions are unsupported by the remainder of the record.  *See* 20 C.F.R. § 404.1527(d); *Castellano v. Sec' of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994).

Plaintiff is incorrect in his argument that the ALJ did not factor in Dr. Lindell's limitation on Plaintiff's ability to sit and/or stand for more than thirty minutes.  In fact, in his RFC assessment, the ALJ specifically found that Plaintiff could sit/stand for only thirty minutes at a time and he asked Mr. Rauer questions using a similar sit/stand limitation.  (*Id.* at 490.)  Thus, the ALJ's RFC mirrors Dr. Lindell's opinion on this

limitation.  Moreover, the ALJ stated that he adopted the entirety of Dr. Lindell's opinion and allowed it to form the parameters of the ALJ's RFC assessment.  (*Id.* at 485.)  This indicates that, even if he did not expressly list Dr. Lindell's other limitations (*e.g.,* low-stress work, unscheduled breaks), he adopted them for purposes of his RFC assessment.  In other words, there is substantial evidence to show that the ALJ adopted Dr. Lindell's opinion and gave it controlling weight.  The mere fact that the ALJ did not explicitly rehash all of the minutiae of Dr. Lindell's opinion in his RFC assessment does not warrant remand on this issue.

The only one of Dr. Lindell's opinions that the ALJ explicitly excluded was the opinion that Plaintiff would need to miss more than four days of work per month as a result of his diabetes.  (*Id.*)  The ALJ reasoned that Dr. Lindell's own records did not support the conclusion that Plaintiff would miss four days per month.  (*Id.*)  This conclusion is also supported by substantial evidence.  Dr. Lindell's records reflect that Plaintiff had trouble controlling his blood sugar on occasion, but the record does not contain any evidence of a functional limitation attributable to Plaintiff's diabetes prior to December 31, 1999, let alone evidence that his diabetes would cause four absences per month.  Indeed, Dr. Lindell's own retrospective opinion indicates that Plaintiff did not suffer diabetic neuropathy at any time prior to the expiration of Plaintiff's benefits.  (*Id.* at 342.)  Moreover, as the Commissioner pointed out, Dr. Lindell did not intend the 2002 Diabetes Mellitus Questionnaire to be a retrospective analysis of the period before December 31, 1999.

Thus, the ALJ did not exclude all Dr. Lindell's opinions in the manner described by Plaintiff and the ALJ's decision to exclude Dr. Lindell's opinion on the absence from work issue is supported by substantial evidence.

### C.    The ALJ Did Not Need An Additional Medical Consultation.

Plaintiff contends that the ALJ should have requested an additional retrospective medical analysis to determine the onset date of Plaintiff's alleged disability.  Social Security Ruling 83-20 (made applicable to "all components of the Social Security Administration" by 20 C.F.R. § 402.35(b)(1)) sets out the procedure for determining the first date of a claimant's disability.  *See* SSR 83-20, 1983 WL 31249 (1983).  The starting point under the analysis is the claimant's alleged onset date, although this allegation is not dispositive.  *Id.*  Work history should also be factored into the decision, but medical evidence constitutes the "primary" factor in deciding when the claimant became disabled.  *See* SSR 83-20 at 2-3.  If the medical evidence does not reveal a precise onset date, the ALJ may infer the date from medical and other evidence regarding the claimant's history and symptomatology.  *Id.* at 2.  If the ALJ has to infer the onset date from the record, he should request a medical advisor to assist in the decision.  Whether an ALJ needs to call for an additional medical opinion turns on whether the record is too ambiguous to permit the ALJ to discern whether the claimant became disabled before his benefits expired.  *Blea*, 466 F.3d at 912.  Or as the Tenth Circuit Court of Appeals phrases it in *Blea*, "where 'medical evidence of onset is ambiguous,' an ALJ is obligated to call upon the services of a medical advisor."  *Blea*,

22

466 F.3d at 911 (citing *Reid v. Chater*, 71 F.3d 372, 374 (10th Cir. 1995); *see also* SSR

83-20, at 3.

According to Plaintiff, the ALJ should have asked for a retrospective medical

analysis because the onset date of Plaintiff's disability is ambiguous.  To support this

claim Plaintiff argues that his impairments were chronic and progressive and that the

record lacks medical evidence from Dr. Lindell during the key period of 1998 and 1999.

Plaintiff attempts to parlay the approximately two-year gap in Dr. Lindell's treatment into

an ambiguity similar to the gap that existed in *Blea*.  However, in contrast to the record

in *Blea*, the record in this case contains substantial "contemporaneous medical

documentation" to support the ALJ's decision.  *Cf. Blea*, 466 F.3d at 911.  As noted

above, Plaintiff had multiple treating physicians and numerous examining physicians

beginning in 1993 and continuing through the date of the first ALJ hearing.  Plaintiff's

medical treatment is well-documented, too.  His records provided a variety of opinions

and evidence from which the ALJ could deduce an onset date without making the type

of unsupported inferences made by the ALJ in *Brea*.[6]

Even during the gap in Dr. Lindell's treatment, doctors and other medical

professionals examined Plaintiff on multiple occasions.  The ALJ had evidence in the

form of (1) physical therapy records from 1998, (2) Dr. Weeks' April 1999 review of

Plaintiff's records, (3) the May 1999 Functional Capacity Evaluation and (4) the

---

[6]  Notably, interpretation of the 2000 MRI revealed "no real significant change compared to the previous study of July 1997."  Thus, unlike the ALJ in *Blea*, the ALJ in this case did not have to make a negative inference from the lack of treating physician records.

December 2000 MRI interpreted by Dr. Shih, to fill in any gap created by the absence of Dr. Lindell.  (Admin. at 265-77, 236 & 169.)  These records stand in stark contrast to the ambiguity that plagued the *Blea* medical record.  As such, there is substantial evidence for the ALJ's decision not to call for a medical analysis.  *See Reid*, 71 F.3d at 374 ("[A] medical advisor need be called only if the medical evidence of onset is ambiguous.").

>  **D.      The ALJ Gave Appropriate Weight To The Opinion Of Claimant's Chiropractor, Dr. Kallsen.**

Dr. Kallsen believed Plaintiff to be "impaired/disabled yet the doctors who could declare him so did not/have not."  (Admin. at 328-29.)  The ALJ rejected Dr. Kallsen's opinion on this issue.  The ALJ found that Dr. Kallsen was not an acceptable medical source and that his opinion conflicted with other medical evidence, including Dr. Kallsen's own records.  (*Id.* at 484.)

Plaintiff concedes that a chiropractor is not an "acceptable medical source" under 20 C.F.R. § 404.1513(a), but argues that the ALJ should have considered Dr. Kallsen's opinion as an "other source" under 20 C.F.R. § 404.1513(d).  There is no dispute that an ALJ can consider a chiropractor's opinion to show the severity of a claimant's impairments.  *See* § 404.1513(d) (noting that other sources include chiropractors).  However, the ALJ need not accept evidence that "is inconsistent with other evidence or is internally inconsistent . . . ."  20 C.F.R. § 404.1627(c)(2).  Thus, the question on appeal is whether there is substantial evidence to support the ALJ's determination that

Dr. Kallsen's opinion conflicts with other objective medical evidence and with his own records.  The Court finds that there is.

A multitude of medical opinions from treating doctors, examining doctors, and other medical professionals supports the ALJ's decision not to accept Dr. Kallsen's opinion that Plaintiff was disabled.  To wit, Dr. Lindell's opinion in the 2002 Diabetes RFC Questionnaire was that Plaintiff could perform low stress work.  (Admin. at 290.) Likewise, Dr. Weeks concluded that chiropractic care had provided "significant pain relief" to Plaintiff, such that Plaintiff should be evaluated for determination of his work-related restrictions.  (*Id.* at 236.)  Thus, the opinions from Plaintiff's treating doctors differed from Dr. Kallsen's opinion.  The 1999 Functional Capacity Evaluation performed on Dr. Weeks' recommendation found that Plaintiff could sit continuously for thirty minutes and stand/walk for over twenty-three minutes, and these limitations were to be considered Plaintiff's minimum abilities.  (*Id.* at 279.)  Other examinations contradict Dr. Kallsen's opinion even further.  For example, the RFC review performed by Dr. Ketelhohn found Plaintiff virtually unlimited in his vocational ability.  (*Id.* at 297.)  Thus, Dr. Kallsen's opinion that Plaintiff was "disabled" contrasts with other medical evidence in the record.

Further, Dr. Kallsen's opinion is internally inconsistent.  In 2002, Dr. Kallsen noted that Plaintiff had "received and benefitted, though not fully, from a wide spectrum of care. . . ."  (*Id.* at 212.)  In this same letter, Dr. Kallsen opined that Plaintiff could not perform any sort of heavy labor, but that Plaintiff could perform light labor with heavy

restrictions as a result of his inability "to maintain one position for any great length of time." (*Id.*)  These comments reflect a more accurate statement of the remaining medical evidence and, indeed, they align nicely with the RFC assessment made by the ALJ.

Therefore, the Court finds that the ALJ's decision to reject Dr. Kallsen's opinion is supported by substantial evidence.

## CONCLUSION

The ALJ could have done a better job in explaining how he considered the *Trimiar* factors.  However, the Court cannot say that his decision fails to meet the substantial evidence standard.  The additional issues raised by Plaintiff also fail to persuade this Court that the ALJ's decisions were not in accord with the substantial evidence in the record.

Accordingly, it is

ORDERED that the Commissioner's decision is AFFIRMED.

DATED:  April __13__, 2009

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge